Thank you, Your Honors. David Beauvais appearing on behalf of the appellant Robert Norse. Also my co-counsel Kate Wells is here with us at council table and Mr. Norse is present in the front row. We intend to split our arguments today. I'm going to do the argument on the constitutional violation and qualified immunity and Ms. Wells will do the argument on Monell. I realize that there are other issues raised in the brief and unless the court has any questions about those issues, we intend not to address them. And the split will be four minutes, four minutes and two minutes for rebuttal. Well, we're here again and now the court's had a chance to see the video of the March 2002 incident. And it's very faithful, I think, to the allegations that we made in our complaint that you upheld on a 12b6 challenge. But I will go through it a little bit because I think people have differing perceptions about what a disruption is. And I think it's clear in light of the court's memorandum order in this case back in 05, I believe it was, or 04, that in order to establish that there was a constitutional violation, the defendants have to show that there was a rule violation plus a disruption. And I think we could concede on the basis of these rules that are very broadly written that directing a Nazi salute to the mayor is probably an act that's indecorous or it's probably an act that's probably people could reasonably take offense to. But at the same time we're dealing with the First Amendment and the First Amendment allows for such speech. And we can talk about where the speech is, we can talk about traditional public forum at one end where the maximum protection for First Amendment activity exists. And we can talk about a prison, for example, where it's at the other extreme. And this is somewhere in between those two. Counsel, are we taking the 2002 and 2004 incidents together or do you suggest there's a significant difference between each of those two incidents, which, as I understand, Judge White found to be disruptive? Yes. Yes. Well, factually they're, you know, obviously distinguished, but the same principles of law are going to apply. And I think Well, which is the easier case? Well, I salute or the conduct in the second hearing. The salute is easier on assessing what the facts are. The second incident is more difficult. And we, it's basically our position that insofar as disruption is concerned, that's a question that really should be determined by the jury. Because the disruption has to be substantial under In Re K, which is the 1970 California case that defines Penal Code Section 403, under which Mr. Norse was arrested. Well, now, we have the Kint case, K-I-N-D-T, which seems to be pretty central, does it not, to our analysis of this issue? Assuming it is, how would you distinguish Kint from each of the other two incidents? Well, we don't concede there was any disruption at all. And obviously there wasn't Kint. And if there's no disruption, there is a constitutional violation. By the way, let me just back up a minute, just so we're all on the same page here. As I understand the procedure in the district court, there was no trial, right? There was no trial. It was sort of like at a pretrial hearing, right, something like that, there's no motion pending, but apparently Judge White had this, what, DVD, some kind of recording of the, right? He did. Because we had tendered that as evidence. Well, he had that on both incidents. Is that right? They were both recorded. They were both recorded, but the second one wasn't completely recorded. Well, so there was an audiovisual recording, right? Yes. Of the 2002 incident, and then an audiovisual recording of, we'll say most but not all of the 2000, and was it four or five incidents, right? Well, some but not all. I don't know if it was most. Are you contending that the portion of the 2004 incident that wasn't recorded is relevant to this appeal? Well, I think that it's relevant to this appeal because we're trying to get an opinion on what happened during the time that's not recorded or not. Yes, we are. We are. And what difference does that make? Okay. The reason is that Mr. Norris was accused of whispering and that was the basis for him being admonished by the mayor. And the whispering happened during the part that was not recorded? Well, you can't hear him say anything. What I want to know is what in the portion of the meeting that was not recorded is relevant to this appeal? Well, I... Anything? Yes, because... Tell me what. All right. Because at that meeting, the mayor had adopted a three strikes you're out rule. And as the court may recall, people came into the courtroom in a file and they talked between the counsel and the audience and they made a loop around and they went out and the mayor said, please stand and back with your signs, which didn't sound like an admonishment to me, but everyone complied. Then when Mr. Norris was... The next time the attention was directed to Mr. Norris, he was leaning over the aisle whispering in someone's ear and... No, that's on the recording. Yeah, but we can't hear the whisper. I suppose that's good for us, that the fact that the recording demonstrates that it wasn't loud enough to disrupt the meeting. And we also, I think, tendered as an offer of proof that the city's own system didn't pick up Mr. Norris making any audible sound. You only have three and a half minutes left. And so what happened in the part that's not recorded? I want to see you, both of you. Well, we have other people who will say, for example, that Mr. Norris did not disrupt the meeting. We have witnesses. In your point of view, what's your proffer as to what happened during the unrecorded portion? That's material. Well, Mr. Norris left. Yeah, he left and he came back. Other witnesses will testify that other people were whispering throughout this meeting. They were dressed in suits. They looked like city people. They weren't admonished about whispering. All right. So there was a selective attention to Mr. Norris. Okay. I'm just kidding. All right. Now, but then getting back to the part that's recorded, you agree that that, in essence, constitutes the record of the trial court that we're reviewing? Oh, it does. Yes. Whatever procedure was involved? Right. Okay. But as I said, we did have other witnesses. And it looks to me like I need to defer to my co-counsel. Right. Well, could you just highlight for me what it is the exact conduct that you regard as on the part of the city and the debt is the clearest violation of your client's rights? Well, the fact is he did not disrupt the meetings. Either one of the meetings. And, therefore, he could not be ejected, and, therefore, he could not be arrested and taken to jail. I'm sorry. Is it the being ejected that is the real violation? Or do you say even if he could have been ejected, they shouldn't have arrested him? Or even if they could escort him out? Oh, I agree with that. Yeah. I'm just trying to figure out what you mean. Yeah. I think the First and Fourth Amendment violations are distinct violations. And, no, he could not be ejected under these circumstances. And, no, he could not be arrested. There was no probable cause under 403, even if he could be ejected from the meeting because he didn't disrupt the meeting. Now, if there was a rule of law that said it's okay for city councils to just throw anybody they want to arrest them. Well, no. That's not this case. Right. But even if the ejectment to enforce the rules was okay, then the arrest was improper. It's a violation of the Fourth Amendment. Is that? Right. Under In Re Cay, I think, makes that case. All right. Thank you. Thank you. We'll be lenient on time. We've all been around a long time on this case. Good afternoon, Your Honors. My name is Kathleen Wells. And I'd first like to point out the fact that I have brought my father, who has turned 94 years old, yesterday with me. He promises not to disrupt the meeting. However, if you're really bad to me, I don't know what he'll do. Anyway, I'm here to talk about the Monell issues and the city's liability. And as I'm sure you're aware, there are basically three different ways that we can prove, we can attribute these actions to the city. Is there a policy that you can point to? Well, what we have is the policymaker. We have the mayor, who makes up the rules, and the city council acting together in this action. And there's really no one above them. What is the policy? I mean, surely it isn't unconstitutional policy to enforce rules of order in a meeting. The policy is the same one we objected to originally, as on the face of the rules of decorum themselves. They don't require a disruption. In your decision, you said that the rules are constitutional because you implied a disruption. As part of the breaking of these rules. But the rules of decorum themselves do not call for any kind of disruption. They just say if you do this, you're ejected. This is the policy we're talking about, and this is the exact thing that happened in this case. Do what? What does the rule provide?  Do what? What does the rule provide? Use indecorous language. Use language that tends to bring the council members into disrepute. Very general terms, but. If an individual gets up at the microphone and starts swearing at the city council members, what can, in your view, the council do in that circumstance? Well, I would say that they would definitely be disrupting what is happening. I mean, what we have here is someone standing off to the side of the room, silent, in a situation where they allow regularly people to stand with signs, holding up signs, so he's standing off to the side of the room, and in a momentary gesture does the Nazi. So if someone is swearing at the council, and the council says, the mayor says, that is a disruption, I want you to escort this person out, and then someone else makes, protests the ejection by saying something that is not appropriate, that would be a disruption, too, I suppose, if that person were to start swearing. As I see it, a disruption is a disruption. It's whether or not the meeting is actually disrupted. And it's clear from the videotape, or the DVD, or whatever it is, that there is no disruption to the meeting. The meeting is going on. The disruption comes from one of the city council members, who points out what happened, and at that point they stop. No, as I understand it, the person at the microphone was pointing to something that was going on at the back of the courtroom when that person was asked to leave because their time was up at the microphone. No? That's why you have to be clear. Are you speaking of the first meeting or the second meeting? Talking about the first meeting. And what happens is a woman gets up to speak, and the mayor tells her that oral communications is closed. Well, she had a time limit which she exceeded. Isn't that the problem? No, she actually didn't get to speak at all. She was the last speaker in line. He told her that oral communications was over. As I understand it, there was a reserved portion for oral communications. Was it 30 minutes or? I'm not sure. But in any event, whatever it was, that time ran. Other people were heard and they spoke, and the time for oral communication had terminated. That's correct. And then this person came along and apparently demanded time. Is that? No, she was the last person in line, and she just got up to the podium, and at that point, the mayor said, I'm sorry, oral communications is closed. Right. Okay. And she said, but I'm the last person in line. You know, I just have a few. And at that point, he tells her to step away or she will be removed, basically. Well, there are sounds of disturbances at the back of the room, of noise at the back of the courtroom at that time. I reviewed the tape. And then is this, is there another videotape shot facing the rear? You know, there's really nothing going on that is pertinent to this. You know, like I said, what led up to this incident is the woman, you know, with Well, regardless, that was a ruling of the chair, right? Right. Time for public speaking is expired. Step away. Right. So what? And so as you She didn't do it. Pardon? And she did not step away. Yes, she did. Well, after he told her that it was over, she protested somewhat and said, well, I'll ask her. She didn't step away. She protested. And at that point, he said, step away. And she did. She walked away towards my client, who did at that point his silent momentary gesture, which did not disrupt anything. The meeting went on. So in your view, the question is whether or not Mr. Norris's Nazi salute was itself disruptive? That's correct. That's the issue? That is an issue, yes. Was that the issue? Well, it's not the only issue. I mean, obviously, this was action taken because of the content of his speech. If he'd blown a kiss to the mayor or done a peace symbol, none of this would have happened. We've gotten a little far from the mail. I know we've gotten far afield. I actually didn't come prepared to argue this. Let me ask just one question, though. So part of your case is that the action taken against Mr. Norris for that Nazi salute was based upon the content of the speech? Absolutely. Absolutely. And like I said, regularly people line up along the side exactly where he was with signs. And they don't say, oh, you can't do that because oral communications is closed. They allow that to happen. And I know that Mr. Kovacevic will admit that that happens regularly, all along the side and all around the back. I don't think a Nazi salute is any different in nature than someone saying peace. Yeah. Or simply wanting a disapproval. Well, I mean, certainly it was being critical of the council's action, definitely. That's what the symbol implied. It's a personal attack. Is it not on the presider at the meeting for allegedly running the meeting in a way which this person suggests is the way a Nazi organization would do it? I'd say he was being critical of that action that happened just then. But it's a personal attack, isn't it? Isn't it personally offensive? Don't you think in the end all these different meanings of the salute is a question for the jury to decide? I definitely feel that way because, of course, Enrique says that it's not just a disruption. It has to be a substantial disruption. And because of that, it is a question of fact for a jury, not something decided as a matter of law as to whether or not there was a substantial. With respect to Monell. Pardon? With respect to Monell. Monell. What, in a nutshell, is your case against the county? Okay. The mayor and city council were not quite sure what because we didn't have a chance to develop all of the facts in terms of we didn't realize that we were going to be facing this issue up to the, you know, four days before trial.  And so what we did was each mayor came in, made up their own rules, and then the council together decided what to do as a legislative body. So they were enforcing rules that they had promulgated. This is their rules. So the rules are no, but the rules are a violation? Enforce what is the rule? The rules are their policy, basically, of how they run the meeting is what we're saying. But the rules, the rules are not violative of the First Amendment, are they? Only if, as you said, not all of you, two of you said, only if you imply an actual disruption. No, but we're talking about now the policy for which the city could be liable, right? And is the policy invited by the rule? The policy is invited by the rules because the policy, the rules themselves have no, no word about the disruption. I understand what you're saying. You're saying that the policy is to enforce the rules in a way that authorizes ejectment when there is no disturbance. Exactly. Exactly. Thank you. And that's true of both instances. We're about double our time now. Oh, I'm sorry. Okay. Good afternoon, Your Honors. Before you get at me, if I could just indicate to you what I've come here to ask, that you uphold the judge's decision, that you deal more specifically and definitively as to whether this is a limited public forum or a non-public forum, because I think the Ninth Circuit has danced around that issue. First of all, how do you characterize the judge's ruling? Is it sort of like a non-suit before the opening statement, or what was it? Yes. What was it? There was no motion, right? There was no, you know. Yes, Your Honor, there was a motion. Motion by whom? The motion was a rule. By whom for what? To motion to bifurcate and take the legal issues, including qualified immunity. A motion to bifurcate? I'm sorry? What did you say, a motion to bifurcate? Correct. To take the legal issues separate from the factual issues. And then our position is, is there were no disputes of fact with respect to the pertinent legal issues. Well, what about the fact about, you know, what does the salute mean? Pardon? Is it your position that the salute itself was disruptive? My position is, is that the salute in conjunction with him interrupting Councilmember Fitzmaurice in trying to make what he rightfully had a right to do a rule of order, that caused the disruption, yes. And you think that can be decided as a question of law? I think so, if the facts are undisputed. Is that subject to more than one reasonable interpretation? I do believe it can. It's just like people can decide probable cause if the facts are undisputed. I mean, judges can decide probable cause. Judges can decide who the policymaker is. That's a legal issue if the facts are undisputed. What about the fact that apparently, you know, some of the second meeting was not recorded, so we don't know that, yes, there were a lot of other people who were whispering and, you know, they weren't thrown out? Well, I pointed that out in my brief and dealt with it. First of all, our office is the one that prepared these DVDs, and we included everything having to do with Mr. Norris and his ejection. From your point of view. Well, I guess the question I have is, like Judge White did, is, you know, you talked about pro-offer here, and Ms. Wells said, well, we were just, you know, four days before we heard about this, but this was the beginning of the trial. The trial was the 26th of March. That's when the bifurcated portion of the trial started. If they didn't have their pro-offer then, and I kind of object to her talking about what they said in depositions because they didn't present that to the court at that time, and they didn't make their record. And so if there was something that was not on that tape, they never came forward with it at the critical time, which is the trial. And I'm telling you as an officer of the court, there wasn't. It's on there. I argued in my brief. You can see they're talking about whispering on the tape that you have. So what you're saying is, after hearing that Judge White held, that the plaintiffs had the opportunity to make some kind of proffer if they thought whatever you produced was incomplete and they didn't proffer any other evidence and they didn't object to yours. Precisely. Is that a fair statement? That's not only a fair statement. It's the only correct statement. And the other thing I would indicate is in terms of the first incident, there were two tapes. One, I think Justice indicated, you know, viewing to the rear, but the first one was the tape of the city because the cameras are only facing typically the podium area. The second one was their own tape. Is that what that was? I'm sorry? I was wondering. The one that was showing. Well, that actually showed the Nazi salute. That gold. Mr. Norris. Was there. It was directed toward the audience. Correct. It was their recording. Okay. So, and I think if you read the transcript, it was pretty clear that Judge White gave them the latitude, you know, the courtesy, you know, what do you have? Give it. I mean, and they didn't say, well, wait a minute, give us a day. We're going to go get this unedited tape. So I think I've covered a few of those things. But the other thing I wanted to say before I get further along is I really want this court, and, you know, I tried to indicate the first time around, but Justice Takashima had some things that, you know, he wanted to talk to me about, so I never got to it. But I really think the Ninth Circuit needs to deal with this issue of whether there's any speech, right to speech. And that's why I've emphasized, you know, the Ninth Circuit has made a cookie-cutter approach to this type of proceedings. I'm sorry. Whether there's any right to speech, is that what you're saying? To speak at all. Right. Because what we're dealing with here, whether a limited or non-public forum, is we're dealing with certain stages. We're dealing with oral communications, which is a general one. You can come in and say whatever you want as long as you comply with the rules. Then you have other public comment, but it has to be limited to the agendized item. And then lastly, you have periods of time during these meetings when there's nobody that can talk, because it's like you take things in your chambers under submission and ruminate and discuss them. The council does that in public, but not at a time that anybody from the public can speak. And, in fact, in the second incident, that's exactly what was going on. They were debating and discussing the matter amongst themselves. And as I pointed out in my brief, that's when after this ridiculous parade, a council member, boy, his name shouldn't slip my mind, but, you know, he goes, wait a minute. He was in the middle of talking to his co-council members, and then he says, wait, you know, I've lost my train of thought. So, you know, to talk about reasonableness, as the Ninth Circuit has, disruption, it doesn't necessarily fit if you're doing it at a time when you really have no right at all. So when Mr. Norris does his Nazi salute over there, it is clear, and this was an issue that was debated the first time, whether all communications were closed. I think Justice Takashima asked that. I submitted evidence of judicial notice at the trial level that it was closed, but now we know definitively because Mayor Crone says it's closed. At that point, nobody has a right to First Amendment right to speak. Counsel, where does the Kint case fit? You heard my question to Mr. Beauvais and his answer on that. He said, well, that was clearly a disruption case. Well, what does it tell us with respect to the case in front of us here? I put it in my brief. Well, I want you to tell us. Tell me now. Well, I'm always accused in the Fifth Circuit of not ñ well, I'm not really accused. I just care not to repeat my brief because they don't want us to. But I actually pulled, you know, that area out. And the Court basically said that the record shows these people, the individual was rightfully ejected. And in one of them, he is just sitting there with a cohort. What case is this? I'm sorry. What case is this? This is Kint. K-I-N-T. I'm not sure how it's pronounced. Go ahead. In one instance, the person that challenged and litigated was sitting next to what the Court called a cohort. Now, I don't even know from reading the case how the Court divined that this was his cohort. But apparently the moderator thought, and that's the language of the court in Kint, that the companion, the cohort, made some obscene gesture. And they both got kicked out, and Kint says that was appropriate. Okay. Well, we got Mr. Norris red-handed. We know what he did. There's no dispute based on the tape. And this is what he did. And I just asked the Court, and I'm sorry, please, become realistic here. If this ñ if I was ñ If you move too far away from the microphone, we're not going to get you. Okay. I was trying to demonstrate. If I walked away and you started to say something, I was done with my argument. And you started to say something. And I came back, wait, wait, that's not correct. And I started challenging you and getting in your face. Mr. Norris is the kind of guy that likes to get in people's faces. And then you kind of said something, and I started to walk away, and then I came back at you. I mean, I don't know that you would tolerate that. I think you would say, Counsel, your time has been up. Get out of here. And then I would go, well, wait a minute, I want more time. What if I disputed you and I wanted more time? I mean, this is what my clients have to deal with. And I think the language in kind is very appropriate. These are not to be circuses. These are not to be ñ and I ask you to address that. These are not to be personal attacks. Would it be a correct interpretation of that case to make an equivalence between the Nazi salute and the obscene gesture? Well, I don't think there's any doubt. In fact, if I could indulge you for a little bit, when I drove up here the first time for the first hearing, I tried to think, how could I get your attention? What if I flipped you off? And, of course, I wasn't going to do that because I'm an officer of the court, I respect the dignity of the court, and I wouldn't do it. But what if somebody was standing back there right now and you made some comment, you know, taking on those counsel, a friend of Norris, and he stands up and just gives you the big one? I mean, what does that do? Does that divert your attention? What is the level of disruption that's required? That's what I'm asking you to also address more tightly than kind has. Well, there is a factual assertion here by the other side that the mayor, that's a different mayor, didn't see the salute. It was brought to his attention by the councilman, Mr. Fitzmaurice, I believe. Is that significant? I don't think it is significant, no, because what he knows is, number one, I think, you know, number one, I'm sorry because we didn't make copies of those DVDs. So I went to the district court to try and get copies, and they were already transferred to you. But I believe one of the exhibits has a lot of history of Mr. Norris at the council meetings. Listen, you're over your time, but if Judge Troy wouldn't mind, I'd like you to just take a minute and address the Monell issue. Yes. In other words, I guess, you know, let's assume for purposes of that, this discussion, that there is some basis to hold, you know, that there was a constitutional violation. Now, if there were, then should the city be held liable under Monell? Well, it depends on whether the policy was violated. First of all, it's a question of whether there was a policy, and secondly, whether it was violated. Now, I think Ms. Wells, at the suggestion of Presiding Justice, agreed what we're saying in our papers, what the policy is, is whether Mayor Crone or Kennedy were establishing policy to violate Mr. Norris's rights by using the pretext of disruption to eject. It isn't a policy of using the rules. You've already ruled the rules are constitutional. So what I would cite you to, additionally, outside of my brief, is Fiorenzo v. Nolan, 965 Federal 2nd, 348, at page 351. It's a Seventh Circuit case, 1992, Your Honors. Quoting, a municipality is not liable merely because the official who inflicted the alleged constitutional injury had the discretion to act on its behalf. Rather, the official in question must possess final authority to establish municipal policy with respect to the challenged action. Well, isn't that true of the mayor and the city council? They do have the final authority to establish policy, don't they? Oh, they do. Yeah. But not with respect to. So how does that case help you? Because you've got to look at whether the official, the challenged action, they had final authority. I mean, I have to answer your question. In a broad sense, they do have final authority. But with respect to ejecting an individual, they don't have final authority. Who does? The council. The council can overrule that. Wait a minute now. I assume, you know, the ordinary rules of what I'll call parliamentary procedure, to the extent they're not inconsistent with the rules of the council, apply. And that means the presiding officer, in fact, that's what he did here, right? He ordered the policeman to arrest the guy, didn't he, the presiding officer? Yes. He has that power, doesn't he? He has that power subject to being overruled. The presiding officer of the council. Your Honor, subject to being overruled by the council as a whole. And the council didn't. So, in fact, they ratified it. In fact, isn't it true, you know, they can suspend the rules, right, as a body, anytime they want to. They have the authority to do that, right? I don't think our council would try to do that. You don't agree with that? Too much flack. But I don't know that. I don't know the answer to that. I mean, they can change the rules. Not just ordinarily parliamentary procedure, right? You can suspend the rules. Well, I know they can change them. You say suspend. No, without changing them. Just suspend them for now. Well, you have a two-thirds vote, and it's a formal matter. I don't quite understand what this has to do with Monell. The argument in Monell, as I understood it, was that the county has a policy of injecting people when there has been no disturbance. Right. And that that policy is that that rule, that that's the policy that they follow. Now, if I understand your position, there was a disturbance, but even if there was they don't have a policy to that effect. Even if there wasn't a disturbance, there's no policy. Right. And that's why I hope you saw the other instances, and I pointed out in my brief, when Mr. Norris had simulated the gesture at other times that he had a right to speak on generalized matters, and they didn't inject him. Okay. Now, let me ask you one final question. Perhaps it will be final. With respect to the arrest, isn't there a separate issue with respect to enforcing the rules to eject someone who has violated the rules or is creating a problem or at least arguably creating a problem, and putting him under arrest, hauling him down a police station, whatever happened here? Well, I think there is a difference, but I think the situation here is that he wouldn't leave. In either instance, he wouldn't leave. Wouldn't leave where? The chambers. The chamber. He wouldn't admonish the ejectment. But wasn't he arrested outside? No. He was arrested inside. He was taken into custody, but what happened to him when he got outside? He was taken, I think, to jail. Yes. By the way. I guess that's what I'm questioning. Is there some independent problem with taking him off to jail after he's been ejected from the meeting? Well, the basis of that is, based on the officer making a decision, there's probable I don't know, right? I'm sorry. When the officer was asked, by Norris, why am I being arrested, he says, I don't know. Isn't that what he said? Well, he didn't know the code section. No, I'm not sure you can look at it that way. Well, didn't he say that the district attorney's office will give me the code section? He made some reference to city attorney's office, I think, yes. But, I mean, he's an officer. He's obviously He's carrying out, you know, the direction of the presiding officer. That's correct. He probably doesn't have any discretion, does he? Well, that's what I pose in my brief. If he wants to keep his job. That's what I pose in my brief. It would be an awkward situation, to say the least, if he second-guessed, just as if you're Well, you don't have bailiffs here, but yes. Because there's nothing in the written policy that says if somebody's already ejected and they don't leave, they're subject to arrest, is there? No, there's nothing indicating that. It's not pursuant to city policy. And, Your Honor, I want to indicate that whether the officer doesn't have the description of what the standard is, is whether to you, if the facts are undisputed, there is probable cause. As an objective, on an objective basis. Right. Right. Without regard to what he believed. Right. I agree with that. Correct. So if you could deal with this, I beseech you in closing to deal with, you know, specifically these issues about speech and having the right to speak at all, personal attacks. Is protest appropriate in these forms? Childish, you know, antics by adults. And also, you know, instead of everything else we said here, there's the qualified immunity. And also, I'm asking you to deal with this issue of absolute immunity. The Hansen case said it's an open question. Only Scroggins, I think, or Collison, in the Collison case, Judge Justice Wilkinson, dealt with it head on. Well, that only takes care of the members of the council. It wouldn't apply to the city, would it? No. So I'm saying the Minnell issue, I say there's no policy. First of all, there's no violation. So the city can't be liable. Secondly, there's no policy, so therefore they can't be liable. There's qualified immunity at a minimum for the rest of the individual members. And maybe even absolute immunity. And maybe even absolute. Thank you very much. Thank you. We have already taken more time than we devote to the Exxon Valdez. So does anyone have any questions of the appellant? Thank you for your time. Thank you. Is there an adjournment? That concludes the Court's calendar for this afternoon. The Court stands adjourned.
judges: Schroeder, O'scannlain, Tashima